[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 1, 2006
THOMAS K. KAHN
CLERK

No. 05-16555
Non-Argument Calendar

_____

BIA Nos. A96-269-540 & A96-269-541

RAFAEL HERNANDO COLMENARES ROMERO,
LILLIANA MARIA RIVERA GUTIERREZ,
JUAN CAMILO GONZALEZ RIVERA,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(August 1, 2006)**

Before TJOFLAT, BIRCH and BARKETT, Circuit Judges.

PER CURIAM:

Rafael Hernando Colmenares Romero ("Romero"),[1] through counsel, petitions for review of the Board of Immigration Appeals' ("BIA") decision adopting and affirming the Immigration Judge's ("IJ") order denying his application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), and ordering him removed to Colombia. He challenges the IJ's finding that his asylum application was untimely and argues that substantial evidence does not support the IJ's finding that he failed to demonstrate his eligibility for withholding of removal under the INA and CAT. We DISMISS the petition as to the timeliness issue for lack of jurisdiction and DENY the petition as to the IJ's findings regarding Romero's eligibility for withholding of removal under the INA and CAT.

## I. BACKGROUND

On 7 June 2000, Romero, a native and citizen of Colombia, was admitted to the United States as a nonimmigrant visitor with authorization to remain until 6 December 2000. R1-446. On 24 August 2000, Romero's wife, Lilliana Maria Rivera Gutierrez, and her son, Juan Camilo Gonzalez Rivera, also natives and

---

[1]Rafael Hernando Colmenares Romero ("Romero") is the primary applicant. His wife and stepson are derivative applicants and rely on Romero's asylum application. We will, therefore, refer to Romero and his claims for relief in this opinion.

citizens of Colombia, were admitted to the United States as nonimmigrant visitors with authorization to remain, after an extension, until 30 December 2001. Id. at 363, 417, 458, 470. In November 2002, Romero filed an asylum application on behalf of himself, his wife, and his stepson. Id. at 362-372. In his application, Romero indicated that he was seeking asylum or withholding of removal based on his political opinion or membership in a particular social group. Id. at 366. He stated that the Revolutionary Armed Forces of Colombia ("FARC") "threatened [him with death] and tried to kill [him]" because he refused "to collaborate with them and to change [his] democratic and moral ideas." Id. at 366, 371. He was raised in a family with democratic principles devoted to helping the community, and had, since his youth, "dedicated part of [his] time to social work." Id. at 371. He attended the Polytechnic Institute GranColombiano and worked in Ecuador as a consultant before starting his own marketing company in 1996. At that time, he also served on the Board of Directors of two shopping centers and as secretary of the Community Action Board ("CAB") in the Canaima neighborhood. In 1998, he was elected secretary of a large CAB zone in the capital, and spoke out against the guerillas in many of his speeches.

He stated that, as a community leader, he participated in social work, including improvement of the open sewer system, and decided to run for councillor so he could represent his community politically. On 30 January 2000, two young

people who "looked like militias" approached him after an assembly meeting and told him that, while they had accepted his work in the community, he should abandon his candidacy because they had their own candidate. Id. On 23 March 2000, two young people who identified themselves as FARC militias visited him at the CAB hall and warned him to stop talking to people about his candidacy or he would be declared a military target and forced to stand revolutionary trial. He continued his work despite the warnings. On 16 May 2000, when he was leaving a shopping mall, he was shot at several times by a man on a motorcycle. He went to the police station, and an officer told him to file a claim at the "GUALA," but when he went there, he was told that "nothing had happened" and was given a book explaining "how to protect [his] life." Id. at 372. He then began receiving rude and threatening phone calls at his home and office, warning that he should stop his community work and he would not escape unharmed the next time. He locked himself in his home. He also received a funeral flower arrangement at his home. Romero stated that he was so nervous and anguished that he began medical treatment, and he left Colombia on 7 June 2000 on medical recommendation. Three months later his wife fled Colombia because she was receiving threats from people looking for Romero. He sought political asylum over one year after his arrival in the United States because he was waiting to see if the peace process in Colombia would have positive results. He feared that he would be killed or

4

tortured by the FARC if he returned to Colombia.

To supplement the asylum application, Romero submitted numerous documents, including: (1) copies of various personal documents, including a state of Florida record of marriage, birth certificates, Colombian citizenship cards, and passports; (2) affidavits indicating that Romero was a member of the board of directors of a shopping center; (3) an affidavit from a mechanic stating that Romero's car had five bullet holes on the left side and middle of the trunk; (4) an affidavit from a friend of Romero's stating that Romero had discussed with him his community work, the threats, and the shots fired at his car; (5) an affidavit from a CAB sub-director stating that Romero held the post of secretary ; (6) an affidavit from the Colombian consulate indicating that Romero served as a collaborator with the consulate during the presidential election in May 2002; (7) an article about a boy who fell into an open sewer; and (8) his wife and son's application to extend their stay in the United States.

On 28 January 2003, the Department of Homeland Security ("DHS")[2] issued a notice to appear ("NTA") to each petitioner, charging them with removability under 8 U.S.C. § 1227(a)(1)(B), for remaining in the United States for a time longer than permitted.

---

[2] The Homeland Security Act, 6 U.S.C. § 101, et seq. became law on 25 November 2002; created a Department of Homeland Security, abolished the Immigration and Naturalization Service, and transferred its functions to the new department.  6 U.S.C. § 291.

At the removal hearing, the petitioners, through counsel, conceded removability and requested asylum. Romero submitted newspaper articles discussing murders in Colombia and arrests of members of the FARC. He explained that he had lived in Bogota most of his life, and his mother and sisters continue to live there. He testified that he graduated from the university and owned electronics stores. He said that, in 1983, he joined and served as the secretary of the Canaima neighborhood CAB, and was also on the administrative board of a shopping mall. He also said that he had collaborated with the Colombian Liberal Party since 1985, promoting meetings to explain the candidates' platforms, but he did not hold a position within the party.

He testified that he left Colombia because members of the FARC threatened his life. R1 at 321-22. He said that on 30 January 2000, during a CAB meeting, two people approached him and told him to stop running for the administrative committee because the position he was running for was reserved for one of their members. The individuals did not identify themselves, but Romero knew that they were FARC militants from the northern part of Bogota. On 23 March 2000, two different individuals identifying themselves as members of the FARC approached him at the CAB office and told him that if he did not withdraw his candidacy, he would face a revolutionary trial, a procedure used by the FARC to try people who are against them, and, if found guilty, to sentence them to death. Romero told the

members of the mall administrative offices and of the CAB about this incident, and changed his daily routine as a precautionary measure.

He testified that another incident took place on 16 May 2000, when his car was shot at three or four times by people on a motorcycle. R1 at 324-25. He tried to file a police report, but "they would not accept it" and told him to go to the "Goala." Id. at 325, 328. The Goala, however, would not accept his complaint because he had not been kidnaped. Id. at 328-29. He stated that the only evidence he had of the incident was a notarized letter from the person who repaired the car. Id. at 326. Next, he received three or four threatening phone calls at his home and his store, in which the callers stated that he would not be able to save himself next time. Id. at 329. He said that the guerrilla wanted an elected position that he was for one of their members. As a result of the phone calls, Romero said that he "became very fearful because [he] realized they could find [him]" so he stopped working. Id. at 330. Within a few days, he received a "funeral flower arrangement" with his name on it. Id. at 330. He became ill and left for the United States. Id. at 331.

After he left Columbia, two people approached his wife at the mall asking about Romero's whereabouts and saying that "they did not want to see [him] there anymore." Id. at 331-32. Romero testified that he believes he will be killed if he returns to Colombia. Id. at 332. He explained that he had not applied for asylum

7

until after he had been in the United States for over one year because he was because he waiting to see if the peace process could be successful and whether Avaro Uribe's election would be able to protect them. He worked for the Liberal Party from Miami during the election of Uribe during the "first semester" of 2002. Id. at 332-33.

On cross-examination, Romero testified that he knew the threatening phone calls were from the people who shot at him because they told him they would make another attempt. Id. at 335. He stated that he had begun campaigning for the contested position when he was first contacted by the guerrilla but, once he vacated Columbia, another candidate ran for the position on behalf of their community. Id. at 335-37. The replacement community candidate did not win the election, remained in Columbia, and was not threatened. Id. Romero explained that he did not initially seek an extension to stay in the United States because he did not plan to stay longer than six months. Id. at 339-40. After his extension expired, he said that he called the immigration office but was told that he could not get an extension because his visa had expired. He sought advice on applying for asylum when he realized he could not return to Colombia. Finally, he stated that, although he was a member of the Liberal Party, he did not have a membership card because he did not participate in the internal meetings and affairs of the party and did not ask for one. Id. at 343-44.

8

The IJ found that Romero's asylum application was untimely, and that no exceptional circumstances or changed country conditions warranted consideration of the application. Id. at 291, 294-97. The IJ then denied the application for withholding for removal and CAT relief and ordered that petitioners be removed from the United States to Colombia. Id. at 303-04. The IJ stated that she had considered the merits of his claim and concluded that Romero failed to credibly meet his burden of establishing that he suffered past persecution or had a well-founded fear of persecution on account of any of the five statutory grounds. Id. at 297. The IJ said that she found "substantial and material evidentiary gaps" in Romero's claim. Id. The IJ noted that while Romero provided documentation that he was the CAB secretary, he provided no documentation through any official authorities in Colombia with respect to the alleged threats and attempt on his life. Id. at 298. The IJ did not find credible Romero's testimony that neither the police nor Guala would take his report, particularly since Romero allegedly was secretary for the CAB and active with the Liberal Party. Id. The IJ also found discrepancies between Romero's testimony and the affidavit of the mechanic who repaired the car regarding the date of the shooting and whether the car belonged to Romero or his wife. Id. at 298-99.

The IJ noted that the letter by the CAB sub-secretary, signed on 12 November 2002, did not reference any of the alleged threats, the reasons Romero

9

did not fulfill his term through 30 June 2001, or why he left Colombia. Id. at 299-300. Further, the IJ pointed to the discrepancy between Romero's testimony and the affidavit of his friend regarding the date of the second encounter with the FARC and whether he received threatening calls on his cell phone. Id. at 300. The IJ also noted that Romero presented no documentary evidence that he was a member or collaborator with the Liberal Party, and she did not find believable Romero's testimony regarding why he was never provided with a membership card. Id. at 300-01. Additionally, the letter from the Colombian consulate did not reflect that Romero was associated with any particular political party. Id. at 301. Next, the IJ found that Romero's subjective fear of persecution was undermined by his delay in filing an asylum application and his failure to seek an extension of his nonimmigrant status after he got married. Id. at 301-02. The IJ also determined that Romero did not file his asylum application within a reasonable period after the extended authorization period expired for his wife and stepson. Finally, the IJ noted that Romero was allegedly a collaborator through the Colombian Consulate for the May 2002 elections when he had not yet filed an asylum application, and he did not file an asylum application until several months after that election. The IJ concluded that Romero had failed to meet the higher burden for withholding of removal or establish eligibility for CAT relief. Id. at 303.

Romero appealed the IJ's decision to the BIA. Romero argued that the

evidence established that he was persecuted on account of his political opinion and his membership in a particular social group based on his activities with the Liberal Party and the CAB. Id. at 160-61. He maintained that he testified in a detailed and consistent manner, presenting sufficient credible evidence to support his claim of past persecution and a well-founded fear of future persecution, and that the IJ abused her discretion by denying asylum and withholding of removal. Romero submitted additional documentary evidence with his brief.

Although the BIA initially summarily dismissed Romero's appeal because he did not submit a brief after having indicated that he would do so, it later granted his motion to reconsider because a timely brief was filed, and addressed the merits of the appeal. The BIA refused to consider the additional evidence and found that a remand was not warranted because Romero had failed to demonstrate that the evidence was not previously available. Id. at 2. The BIA then adopted and affirmed the IJ's decision, noting that Romero had not shown exceptional circumstances to excuse the untimeliness of his asylum application and had failed to meet his burden for withholding of removal and CAT relief.

## II. DISCUSSION

"We review only the [BIA's] decision, except to the extent that it expressly adopts the IJ's opinion [and, i]nsofar as the [BIA] adopts the IJ's reasoning, we will review the IJ's decision as well." Al Najjar v. Ashcroft, 257 F.3d 1262, 1284

11

(11th Cir. 2001). We review challenges to the IJ's legal determinations de novo, Mohammed v. Ashcroft, 261 F.3d 1244, 1247 (11th Cir. 2001), and to the IJ's factual determinations under the substantial evidence standard. Al Najjar, 257 F.3d at 1283. We "must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. at 1284 (quotations omitted); see also 8 U.S.C. § 1252(b)(4)(B)) ("administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to concluded to the contrary"). "Under this highly deferential standard of review, the IJ's decision can be reversed only if the evidence compels a reasonable fact finder to find otherwise." Sepulveda v. United States Att'y Gen., 401 F.3d 1226, 1230 (11th Cir. 2005) (per curiam) (internal quotation marks and citation omitted).

A. Jurisdiction to review IJ's findings on eligibility for asylum

Romero argues only that he was entitled to asylum on the merits of his claims; he does not address the IJ's finding that he failed to demonstrate changed or extraordinary circumstances excusing the late filing of his asylum application.

An alien who arrives in or is present in the United States may apply for asylum. 8 U.S.C. § 1158(a)(1). The applicant, however, must "demonstrate[] by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States" unless the alien can show

(1) "changed circumstances which materially affect the applicant's eligibility for asylum" or (2) "extraordinary circumstances relating to the delay in filing an application" within one year. 8 U.S.C. § 1158(a)(2)(B), (D). We do not have jurisdiction to review a determination of the Attorney General as to the timeliness of an asylum application or the existence of changed or extraordinary circumstances. 8 U.S.C. § 1158(a)(3); Fahim v. United States Att'y Gen., 278 F.3d 1216, 1217-18 (11th Cir. 2002) (per curiam). We, therefore, do not have jurisdiction to review the IJ's finding that Romero failed to establish changed or extraordinary circumstances excusing the untimeliness of his asylum application.

B. Withholding of removal and CAT relief

Romero argues that the BIA erred by denying the motion to reconsider and not using its own independent judgment. He also maintains that the IJ erred by denying withholding of removal because the record reflects evidence of past persecution of his family by the FARC, and that relocation within Colombia was not a possibility. He contends that he established a well-founded fear of future persecution, and that the evidence showed that his life would be at risk if he returned to Colombia.

As a preliminary matter, we note that Romero does not raise any challenge in his appellate brief to the denial of relief under the CAT, and, therefore, that issue is deemed abandoned. See Sepulveda, 401 F.3d at 1228 n.2.

13

The Attorney General may not remove an alien to a country if the Attorney General finds that "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The applicant "bears the burden of demonstrating that it is more likely than not that []he will be persecuted or tortured upon being returned to [his] country," which is "a more stringent standard than for asylum." Sepulveda, 401 F.3d at 1232 (internal quotation marks and citation omitted). If the "applicant is unable to meet the well-founded fear standard for asylum, []he is generally precluded from qualifying for" withholding of removal.[3] Id. at 1232-33.

Persecution is an "extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation. . . ." Id. at 1231 (internal quotation marks and citation omitted). "Threats alone generally do not constitute actual persecution; only rarely, when they are so immediate and menacing as to cause significant suffering or harm in themselves, do threats per se qualify as persecution." Valutev v. Ashcroft, 354 F.3d 1207, 1210 (10th Cir. 2003). Further,

_____

[3] To establish asylum eligibility, the alien must establish, with specific and credible evidence, (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear of future persecution" based on one of the statutorily listed factors. 8 C.F.R. § 208.13(a), (b)(1), (2); Al Najjar, 257 F.3d at 1287. "A showing of past persecution creates a presumption of a 'well-founded fear'[of persecution], subject to rebuttal by the [government]." Sepulveda, 401 F.3d at 1231 (citing 8 C.F.R. 208.13(b)(1)).

14

"[t]o qualify as persecution, a person's experience must rise above unpleasantness, harassment, and even basic suffering." Nelson v. I.N.S, 232 F.3d 258, 263 (1st Cir. 2000).

Finally, an adverse credibility finding can be fatal to an applicant's asylum claim where the applicant fails to corroborate his testimony. Forgue v. United States Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005). An adverse credibility finding, however, "does not alleviate the IJ's duty to consider . . . all evidence introduced by the applicant." Id. Once the IJ makes an adverse credibility determination, the applicant bears the burden to show that the determination "was not supported by 'specific, cogent reasons' or was not based on substantial evidence." Id. (citation omitted).

Romero's argument that the BIA erred by denying his motion to reconsider is belied by the record as the BIA granted the motion to reconsider and considered the appeal on the merits. Romero also does not explain how the BIA failed to use its own independent judgment in reviewing the IJ's decision. Romero neither challenges the IJ's adverse credibility finding nor points to any documentary evidence submitted before the IJ that would compel a finding that it is more likely than not that Romero will be persecuted if he returns to Colombia. At best, the various documentary evidence provided that (1) Romero was a secretary for the CAB; (2) his car had five bullet holes; (3) he discussed alleged threats and shots

15

fired at his car with a friend; and (4) he served as a collaborator with the consulate during the May 2002 presidential election. The IJ, however, found much of this evidence unreliable, as it lacked important details or conflicted with Romero's testimony, and Romero has not disputed those findings. Substantial evidence, therefore, supports the IJ's finding that he failed to demonstrate his eligibility for withholding of removal under the INA.

### III. CONCLUSION

Because we lack jurisdiction to review the IJ's finding that Romero's asylum application was untimely, we dismiss the petition as to this issue. Because Romero does not challenge the IJ's adverse credibility finding and does not cite to any documentary evidence submitted to the IJ that would compel a finding that it is more likely than not that Romero would be persecuted if returned to Columbia, substantial evidence supports the IJ's finding that Romero was not entitled to withholding of removal and we affirm as to that issue.

**DISMISSED** in part and **DENIED** in part.

16